*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0360p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee* (10-5264 & 10-5432),
   *Plaintiff-Appellee/Cross-Appellant*
    (10-5877 & 10-6084),

   *v.*

LESLIE R. BEALS (10-5264) and PAMELA R.
MILLER (10-5432),
    *Defendants-Appellants,*


BOBBY AMBROSE,
  *Defendant-Appellant/Cross-Appellee*
   (10-5877 & 10-6084).

No. 10-5264/5432/5877/6084

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
Nos. 2:08-cr-58; 2:08-cr-39—Robert Leon Jordan, District Judge.

Argued: January 10, 2012

Decided and Filed: October 16, 2012

Before: SILER and GRIFFIN, Circuit Judges; and TARNOW, District Judge.[*]

_____

## COUNSEL

**ARGUED:** D. R. Smith, LAW OFFICE OF D.R. SMITH, Johnson City, Tennessee, for Appellant/Cross-Appellee in 10-5877 and 10-6084. Caryn L. Hebets, UNITED STATES ATTORNEY'S OFFICE, Johnson City, Tennessee, for Appellee/Cross-Appellant in 10-5877 and 10-6084. **ON BRIEF:** James T. Bowman, Johnson City, Tennessee, for Appellant in 10-5264. Tracy Jackson Smith, LAW OFFICE OF TRACY JACKSON SMITH, Knoxville, Tennessee, for Appellant in 10-5432. D. R. Smith, LAW OFFICE OF D.R. SMITH, Johnson City, Tennessee, for Appellant/Cross-Appellee in cases 10-5877 and 10-6084. Caryn L. Hebets, UNITED STATES ATTORNEY'S

_____

[*] The Honorable Arthur J. Tarnow, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

1

OFFICE, Johnson City, Tennessee, for Appellee in 10-5264 and 10-5432 and for Appellee/Cross-Appellant in 10-5877 and 10-6084.

GRIFFIN, J., delivered the opinion of the court, in which SILER, J., joined. TARNOW, D. J., joined the opinion of the court regarding Beals and Ambrose; and concurred in the judgment only regarding Miller. TARNOW, D. J. (pp. 33–35), delivered a separate concurring opinion with regard to appeal 10-5432.

————————————

## OPINION

————————————

GRIFFIN, Circuit Judge. These four consolidated appeals involve an alleged methamphetamine manufacturing and distribution conspiracy in eastern Tennessee that involved forty-nine indicted defendants. *See* 21 U.S.C. §§ 841(a), 846. Defendant Pamela Miller pleaded guilty and now challenges her sentence. (Appeal No. 10–5432) The government contends that Miller promised not to appeal her sentence as part of her agreement to plead guilty. It moves to dismiss her appeal. Defendants Leslie Beals and Bobby Ambrose chose to go to trial, and a jury convicted them as charged. Beals appeals his convictions on the ground that the evidence was insufficient. (Appeal No. 10–5264) Ambrose challenges some of his convictions on the same ground and also claims error in the district court's denials of his pretrial suppression motion and mid-trial request for the government to disclose the identity of a confidential informant. (Appeal No. 10–5877) Finally, the government cross-appeals Ambrose's sentence, claiming the Supreme Court's intervening decision in *Abbott v. United States*, 131 S. Ct. 18 (2010), renders it unlawful. (Appeal No. 10–6084)

For the following reasons, we dismiss Miller's appeal as waived, affirm Beals's convictions, vacate Ambrose's sentence, and remand Ambrose's case for further factfinding and resentencing. We address the appeals separately.

I.  Miller's Appeal (No. 10–5432)

A.

The government charged Pamela Miller with conspiracy to manufacture 50 or more grams of methamphetamine and 500 or more grams of a mixture or substance containing methamphetamine, as well as possession of equipment used to manufacture methamphetamine.  She agreed to plead to the lesser included offense of conspiracy to manufacture 50 or more grams of a mixture or substance containing methamphetamine in exchange for the government's promise to dismiss the possession charge.

As part of her plea agreement, Miller stipulated that she conspired to "manufacture approximately 80.43 grams of a mixture and substance containing a detectable amount of methamphetamine, . . . and that [she] purchased 146.25 grams of pseudoephedrine which [she] provided to other co-conspirators to manufacture methamphetamine."  The plea agreement states that "this quantity of pseudoephedrine converts to 1,462.50 kilograms of marijuana."  The district court accepted Miller's guilty plea.  It then sentenced her to 120 months' imprisonment, the bottom end of the Guidelines range it calculated.

Miller challenges primarily the district court's decision at sentencing to use the marijuana equivalency of the pseudoephedrine she purchased, instead of the quantity of the mixture and substance containing methamphetamine she conspired to manufacture, to calculate her Guidelines range.  The court's election to do so increased Miller's Guidelines range and ultimate sentence.

B.

The government has moved to dismiss Miller's appeal on the ground that she waived the right to appeal her sentence as part of her plea agreement.  We agree and therefore grant its motion.

Miller's plea agreement contains the following provision regarding appeals:

> [T]he defendant agrees not to file a direct appeal of the defendant's conviction or sentence except the defendant retains the right to appeal a sentence imposed above the sentencing guideline range as determined by the district court.

Miller received a within-Guidelines sentence.

The law in this area is well-settled: "Criminal defendants may waive their right to appeal as part of a plea agreement so long as the waiver is made knowingly and voluntarily." *United States v. Swanberg*, 370 F.3d 622, 625 (6th Cir. 2004). When they do so, "[o]nly challenges to the validity of the waiver itself will be entertained on appeal." *United States v. Toth*, 668 F.3d 374, 377 (6th Cir. 2012). Miller does not contend that her plea was unknowing or involuntary. She instead argues that the waiver provision does not cover challenges to the district court's alleged misapplication of the Sentencing Guidelines and, alternatively, that the waiver is unenforceable on account of the government's breach of the plea agreement. We take the arguments in turn.

1.

The terms of Miller's appeal waiver are broad. She waived the right to appeal any sentence unless it is "above the sentencing guideline range *as determined by the district court*." (Emphasis added.) Reasonably read, this language defers to the district court's discretion in calculating Miller's Guidelines range and permits her to challenge the resulting sentence only if it exceeds the top end of the range the court calculates. Miller's sentence does not exceed the top end of the range as calculated by the district court. Therefore, the appeal waiver covers her present sentencing challenge and precludes our review.

Had Miller wished to preserve a challenge to the district court's Guidelines calculation, she certainly could have bargained for it. *See, e.g.*, *United States v. Brandon*, 445 F. App'x 845, 846 (6th Cir. 2012) (plea agreement stating that "Defendant retains his right to directly appeal the Court's adverse determination of any disputed guideline issue that was raised at or before the sentencing hearings"); *United States v. Deanda*, 450 F. App'x 498, 499 (6th Cir. 2011) (agreement stating that defendant

"waives the right to appeal a sentence that is within or below the guideline range as determined by the Court at sentencing . . . except that the Defendant may appeal on grounds, preserved at sentencing, that the Court incorrectly determined the guideline range"); *United States v. Vandewege*, 433 F. App'x 388, 389 (6th Cir. 2011) (same); *United States v. Flowers*, 428 F. App'x 526, 527 (6th Cir. 2011) (same). We must give effect to the intent of the parties as expressed by the plain language in the plea agreement. *See United States v. Moncivais*, 492 F.3d 652, 662 (6th Cir. 2007) ("Plea agreements are to be enforced according to their terms.").

Resisting this conclusion, Miller argues that the waiver provision "clearly presupposes a correct calculation of [her] sentencing guideline range" and thus permits her challenge. She relies primarily upon *United States v. McCoy*, 508 F.3d 74 (1st Cir. 2007), but that case offers her no support. There, as part of his written plea agreement, the defendant waived his right to appeal any sentence that fell "within the guideline range." *Id.* at 78. The court held that such language "does *not* waive the right to appeal an alleged misapplication of the guidelines." *Id.* Miller's waiver provision is unlike the one in *McCoy*. Indeed, *McCoy* distinguished the language in the provision before it from language in provisions like Miller's that waives a defendant's right to appeal any sentence imposed within the Guidelines range "as determined by the district court." *Id.* at 78 n.4. Such "[b]roader appeal waivers," *McCoy* suggested, could preclude appellate challenges to the district court's Guidelines calculation. *Id.*

In *United States v. Giganti*, 405 F. App'x 31 (6th Cir. 2010), we held that an appeal waiver that extinguished a defendant's right to appeal any sentence "within or below the guideline range *as determined by the Court at sentencing*"—which is what Miller's provision says—precluded any challenge to the district court's Guidelines calculation. *Id.* at 37 (emphasis added). We found that the waiver provision was "very different" from the one in *McCoy*, and we expressly recognized that the discussion in *McCoy* regarding alternative waiver language in fact *supported* a finding of waiver in the case then before us. *Id.* The Third Circuit reached a similar result in *United States v. Corso*, 549 F.3d 921 (3d Cir. 2008), where it distinguished *McCoy* and concluded that

a provision permitting an appeal only if the sentence "unreasonably exceeds the guideline range *determined by the Court* under the Sentencing Guidelines" explicitly lodges "broad discretion in the District Court to determine the applicable Guidelines range" and "certainly does not permit an appeal challenging the District Court's application of the Guidelines." *Id.* at 928 (emphasis in original). We agree with the reasoning in *Giganti* and *Corso*. Miller's current challenge to her sentence is plainly foreclosed by her appeal waiver.

2.

Miller's alternative position is that the government's breach of the plea agreement frees her from her waiver. According to Miller, the government breached the agreement when it urged the district court to use pseudoephedrine's marijuana equivalency to calculate Miller's base offense level, despite expressly agreeing in writing that Miller had conspired to manufacture 80.43 grams of a mixture and substance containing methamphetamine.

There was no breach. Miller's argument depends entirely upon the premise that the government promised, in exchange for Miller's promise to plead guilty, either (1) to ask the district court to determine Miller's base offense level according to the agreed-upon quantity of mixture or substance containing methamphetamine; or (2) *not to ask* the district court to use pseudoephedrine's marijuana equivalency in determining the base offense level. That premise, however, has no factual basis and is foreclosed by the plea agreement itself, which includes the following relevant provisions:

> The parties agree that the appropriate disposition of this case would be the following:
>
> a)      The Court may impose *any* lawful term of imprisonment up to the statutory maximum . . . .
>
> * * *
>
> No promises have been made by any representative of the United States to the defendant as to what the sentence will be in this case. Any estimates or predictions made to the defendant by defense counsel or any other person regarding the potential sentence in this case are not binding

on the Court.  *The defendant understands that the sentence in this case will be determined by the Court after it receives the pre-sentence report from the United States Probation Office and any information presented by the parties.*

(Emphasis added.)

Miller points to the statement in her plea agreement that she conspired with others to "manufacture approximately 80.43 grams of a mixture and substance containing a detectable amount of methamphetamine."  But the statement is simply that—a statement of fact; it cannot be reasonably read as a promise by the government to make (or *not* make) certain arguments at sentencing.  *See Moncivais*, 492 F.3d at 663 (noting that a plea agreement "must be construed as a reasonable person would interpret its words").  Furthermore, the statement appears in the section of the plea agreement supplying the factual basis for the plea and prefaced by the following:  "These are the facts submitted for purposes of the defendant's guilty plea. . . .  Other facts may be relevant to sentencing.  [The parties] retain the right to present additional facts to the Court to ensure a fair and appropriate sentence in this case."  *Id.*  This language undermines the relevance of the statement regarding the quantity of a mixture or substance for purposes of sentencing.  Finally, any attempt to read the statement as a promise fails in light of the plea agreement's integration clause:  "[The parties] agree that . . . any other promises, representations, and statements whether made before, contemporaneous with, or after this agreement, are null and void."  The government did not breach the plea agreement.

## C.

Because Miller validly waived her right to challenge her sentence, we grant the government's motion to dismiss her appeal.

## II.  Beals's Appeal (No. 10–5264)

### A.

The government charged Leslie Beals with (1) conspiracy to distribute 50 or more grams of methamphetamine and 500 or more grams of a mixture or substance containing a detectable amount of methamphetamine, (2) conspiracy to manufacture the same, and (3) possession of equipment used to manufacture methamphetamine.  By way of five separate indictments, the government alleged that forty-nine defendants were part of the single drug conspiracy charged in counts one and two.  Beals pleaded not guilty and went to trial.  He was tried jointly with co-defendant Bobby Ambrose.  The trial lasted five days.

The testimony at trial showed that Beals assisted others, primarily co-defendant Christopher Baucom, who pleaded guilty and testified against Beals, to manufacture and sell methamphetamine.  Beals's assistance came in the form of supplying Baucom and others with vast amounts of cold pills containing pseudoephedrine, which is then extracted and used to create methamphetamine.  Beals sometimes helped in extracting pseudoephedrine from the pills by crushing and placing them in denatured alcohol.  Once the pseudoephedrine separated from the other ingredients in the pill, it was filtered from the other ingredients and dried.  Beals provided other supplies for the cooks as well, including batteries containing lithium, another essential ingredient used to create methamphetamine.  He also sold the finished product to others.  Baucom testified that Beals helped him cook methamphetamine at least eight to ten times and that each session produced in excess of fifteen grams of methamphetamine.

At the close of the evidence, Beals moved for a judgment of acquittal on all three counts, but the court denied the motion.  He then argued to the jury that, although he may have been involved in multiple conspiracies to manufacture and sell methamphetamine, the government failed to prove that he engaged in the large, single conspiracy alleged in the indictment.  The jury convicted him on all three counts.  Beals timely appealed.

B.

Beals contends that there was a fatal variance in the proofs on the conspiracy counts—the indictment alleged a single conspiracy but the evidence proved only the existence of multiple, smaller ones—and also that the evidence did not prove that he possessed equipment used to manufacture methamphetamine. We review these challenges de novo. *United States v. Swafford*, 512 F.3d 833, 841 (6th Cir. 2008) (variance); *United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011) (sufficiency of the evidence).

1.

The jury convicted Beals of conspiracy to manufacture and distribute 50 or more grams of methamphetamine and 500 grams or more of a mixture or substance containing methamphetamine. Beals argues that the government proved the existence of only multiple, smaller conspiracies, not the larger one he was charged with joining. In his view, each cooking session was a separate conspiracy that ended after the cook.

A variance occurs when "the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *Swafford*, 512 F.3d at 841 (internal quotation marks omitted). In a conspiracy prosecution, a variance demands reversal only if (1) "the indictment alleged one conspiracy, but the evidence can reasonably be construed only as supporting a finding of multiple conspiracies," and (2) the variance prejudiced the defendant. *United States v. Williams*, 612 F.3d 417, 423 (6th Cir. 2010). Whether the government has proved one or only multiple conspiracies is a question of fact considered on appeal in the light most favorable to the government. *United States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003).

To establish a drug conspiracy, the government must prove an agreement to violate the drug laws—*i.e.*, to manufacture or distribute drugs—and that each conspirator knew of, intended to join, and participated in the conspiracy. *United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002). Its burden is to prove that "each alleged member

agreed to participate in what he knew to be a collective venture directed toward a common goal." *United States v. Warner*, 690 F.2d 545, 549 (6th Cir. 1982) (quotation marks and citation omitted). A tacit or material understanding among parties to a conspiracy is sufficient to establish agreement. *Id.* Agreement need not be proved with direct evidence; it can be inferred from circumstantial evidence reasonably interpreted as participation in a common plan. *Id.*

"A single conspiracy is not converted to multiple conspiracies simply because it can be subdivided, or because there are changes in the individuals involved or the roles that they play in the conspiracy." *Walls*, 293 F.3d at 967. Nor does conversion take place "simply because each member of the conspiracy did not know every other member, or because each member did not know of or become involved in all of the activities in furtherance of the conspiracy." *Warner*, 690 F.2d at 549. In determining the number of conspiracies, we consider whether there was a common goal among the participants, the nature of the scheme, and the extent of overlap in the participants' various dealings. *Smith*, 320 F.3d at 652.

When viewed in the light most favorable to the government, the evidence at Beals's trial was sufficient to permit the jury to find the existence of a single drug conspiracy. First, the government successfully proved a common goal among the charged co-conspirators: the production of a steady supply of methamphetamine in order to satisfy their shared addiction. To achieve this goal, the co-conspirators both taught one another how to make methamphetamine and helped procure the ingredients and supplies needed to make it. The goal was shared by all participants, each of whom was aware to some extent that the conspiracy was larger than simply his or her individual interactions with others. The participants generally agreed that if suppliers provided pills and other materials to the cooks, the cooks would use them to make and share methamphetamine so all could satisfy their addictions.

The nature of the scheme also suggests a single conspiracy. It revolved around a number of individuals, including Donald Huffman, Bobby Ambrose, Christopher Baucom, and Mike Holtsclaw, who knew how to cook methamphetamine and did so

regularly.  The cooks knew that each other cooked and sometimes assisted one another in doing so.  But the cooks could not make the drug without the help of others.  As Baucom explained, making methamphetamine requires a lot of pseudoephedrine.  And although the drug is contained in over-the-counter cold medicine, one person can only buy so many pills at a time, usually just one box, to avoid tipping off law enforcement.  Therefore, cooks depend on other addicts for pills.  Addicts trade cold pills for methamphetamine and then consume what they need and sell the remainder for cash or more pills.  The cooks and suppliers did not deviate from this scheme for satisfying their addictions.  No one, for instance, rather than buying cold pills from a local drug store, imported large quantities of methamphetamine or its precursors from another state or country and sold them to addicts in the area.  The pills were purchased locally and provided to the same handful of cooks, all of whom lived in the area.  The nature of the scheme suggests a single conspiracy.  *Cf. Smith*, 320 F.3d at 652–53 (finding it relevant that each transaction in the single conspiracy "followed an identical *modus operandi*").

Finally, there was substantial overlap in the participants of the cooking sessions. *See United States v. Mitchell*, 484 F.3d 762, 770 (5th Cir. 2007) ("The more interconnected the various relationships are, the more likely there is a single conspiracy." (quotation marks omitted)).  Those who knew how to cook watched and learned from one another.  For example, Huffman watched Holtsclaw cook and discussed with Ambrose various methods for making the drug.  Ambrose also watched Huffman on occasion and once helped him clean up after a cook.  Baucom provided Huffman with pills and testified that he worked with Ambrose, Holtsclaw, and Huffman, among others.  Holtsclaw once helped Huffman steal a tank of anhydrous ammonia, another necessary ingredient in making methamphetamine, from a beverage store.

There also was overlap and cooperation among those who supplied pills. Cooks would not go through the trouble of making the drug if only a small amount would be produced.  Baucom testified that cooking up only one box worth of pills was not worth the effort and was therefore rarely done.  Huffman said he usually tried to cook ten boxes at a time.  Therefore, pill suppliers worked with each other to provide the necessary

amount of pseudoephedrine to make a fruitful cooking session. Similarly, cooks did not always receive pills from the same people; there was significant intermingling. For instance, Christy Gray routinely gave pills to "a lot of different people," including Huffman and Holtsclaw. Jacqueline Wigand exchanged pills for methamphetamine with both Holtsclaw and Ambrose, usually through an intermediary. Jason Woody gave Baucom pills in exchange for methamphetamine. One time, he went with Baucom to Ambrose's garage to exchange pills for meth. Baucom introduced Woody to Ambrose for the purpose of giving Woody direct access to Ambrose so he did not have to go through Baucom. Woody later offered his home as a place where he, Baucom, and Ambrose could cook batches of meth. Daniel Burleson gave pills to Huffman, Baucom, and Sean Queen, another cook, in exchange for the finished product. Lori Collins traded pills with "multiple people," including Holtsclaw and Baucom. Lesia Bradley developed a recipe for manufacturing anhydrous ammonia and shared it with Baucom. She cooked many times with Huffman, who is also her husband, for many years and witnessed him cook with Holtsclaw and Baucom. She sometimes attended gatherings and supervised other cooks, including Holtsclaw, Baucom, and Douglas Morrell. She attended one cook at Beals's home where she provided anhydrous ammonia and helped the cooks start to process pills. Baucom, Woody, and Beals were present. She also knew Ambrose, and the two socialized together, one time getting high with methamphetamine that Ambrose had supplied. This small sample is representative of the overlapping relationships shared among cooks and pill suppliers.

Based upon the common goal shared by the co-conspirators, the singular nature of the scheme used to achieve that goal, and the substantial overlap in participants, the evidence "does not exclude the possibility" that a single drug conspiracy existed. *United States v. Caver*, 470 F.3d 220, 236 (6th Cir. 2006). Beals's alternative interpretation of the evidence is a nice one that he had the opportunity to argue to the jury in accordance with a proper instruction, but not one that the Due Process Clause *required* the jury to accept based on the evidence. And Beals's further point that not all co-conspirators knew each another or attended the same cooking sessions similarly did not preclude finding a single conspiracy. *See Warner*, 690 F.2d at 549; *see also United States v.*

*Rodriguez-Ramos*, 663 F.3d 356, 362 (8th Cir. 2011) ("One conspiracy may exist despite the involvement of multiple groups and the performance of separate acts." (quotation marks omitted)). The evidence permitted the jury also to conclude that Beals joined this single conspiracy.

*Swafford* is not to the contrary. There, the defendant owned a home-and-garden store out of which he sold iodine, an essential ingredient in making methamphetamine. 512 F.3d at 837. During the time charged in the indictment, the defendant sold large quantities of the ingredient to more than twenty customers, all of whom (except for two) had absolutely no connection with one another. The lack of connection meant that they shared no *common* goal, precluding a finding of a single conspiracy that involved the defendant and all the customers. *Id.* at 842. The same problem does not exist here. As already discussed, there were extensive connections between cooks and the suppliers, who all shared a common goal of manufacturing the drug for the primary purpose of satisfying their addictions.

2.

The jury also convicted Beals of possessing equipment used to manufacture methamphetamine, in violation of 21 U.S.C. § 843(a)(6). Beals contends that the only evidence to support this conviction is the existence of a plastic cooler, hair dryer, and funnels found behind his house. He claims a lack of evidence that these items were actually used to cook methamphetamine or that the equipment had any connection to him. The government seems to agree and points instead to the evidence showing that Beals possessed lithium batteries and high quantities of cold pills containing pseudoephedrine, both of which are used to manufacture methamphetamine. The evidence was sufficient to find Beals guilty of this charge.

C.

For these reasons, we affirm Beals's convictions.

III.  Ambrose's Appeal (No. 10–5877)

A.

Bobby Ambrose was charged with the following offenses:  (1) conspiracy to distribute 50 or more grams of methamphetamine and 500 or more grams of a mixture or substance containing a detectable amount of methamphetamine; (2) conspiracy to manufacture the same; (3) possession of equipment used to manufacture methamphetamine; (4) maintaining a place for the purpose of manufacturing, distributing, or using methamphetamine; (5) possession of a firearm in furtherance of a drug trafficking crime; and (6) being a felon in possession of a firearm.  He pleaded not guilty and was tried jointly with co-defendant Leslie Beals.  A jury convicted him on all counts.  He appeals and raises four challenges.

B.

Some of the evidence introduced against Ambrose at trial—notably the gun that gave rise to the two gun convictions—was seized from his garage during the execution of a search warrant issued by a state-court judge and executed entirely by state officers.  Ambrose moved to suppress this evidence, but the district court, upon the recommendation of a magistrate after an evidentiary hearing, denied the motion.

1.

During the evening hours of April 22, 2008, Michael Hensley, an officer with the Unicoi County Sheriff's Department, presented to Tennessee Criminal Court Judge Robert Cupp an affidavit in support of an application for a search warrant.  Hensley swore in the affidavit that a reliable confidential informant told him he had recently seen the following contraband in Ambrose's garage, located at 106 Union Street in Erwin, Tennessee:  four to five grams of methamphetamine, six grams of marijuana, four Xanax pills, a handgun, glass smoking pipes, and materials for making glass pipes.  Hensley swore also that a records check of ephedrine purchases from local pharmacies revealed that Ambrose and others associated with him had recently purchased at least ten boxes of ephedrine, a key ingredient in making methamphetamine.  The associates had apparently brought Ambrose the ephedrine for the purpose of manufacturing

methamphetamine.  Based on this information, Judge Cupp issued a warrant for the search of the "entire garage area of [106] Union Street and [the] vehicles inside." Although Hensley presented three copies of his affidavit and warrant for signature, Judge Cupp inadvertently signed and dated only one, which he retained as part of his official records in accordance with state rules.  *See* Tenn. R. Crim. P. 41(d).  Hensley left Judge Cupp's home with the unsigned copies, unaware that they were not signed.

The structure located at 106 Union Street is a large building that at an earlier time contained only a garage.  Later, however, a section of the building was partitioned off, and the enclosed section now contains six to eight small, single-room apartments accessed by a separate entrance bearing an address of 108 Union Street.  The portion of the building designated "106 Union Street" contains three areas:  a garage, an apartment where Ambrose and his wife and child live, and an upstairs living area where Ambrose's mother lives.  When the officers arrived, they were unaware of the layout inside 106 Union Street.  From outside the front of the building one sees three doors:  a large garage door, a pedestrian door labeled "106," and a third labeled "108."  The door labeled "106" opens into a hallway that contains two interior doors—one that opens into the garage and another that opens into Ambrose's apartment.  A set of stairs in the hallway leads to an upstairs room where Ambrose's mother resided.  A door in an alley behind the building opens directly into Ambrose's apartment.

State officers executed the search warrant around midnight, shortly after Judge Cupp issued the warrant.  A group went to the front door while others went to the back. The officers at the front door arrested Ambrose in the hallway immediately after entering.  The group in the back knocked on the apartment door and announced that they had a search warrant.  Ambrose's wife answered, and the officers repeated that they had a warrant to search the garage.  They entered and proceeded through the apartment to the hallway that leads to the garage.  Two officers went upstairs to the area where Ambrose's mother lived to briefly look for persons before meeting the remaining officers in the garage to assist with the search.

During the search of the garage, officers found and seized contraband, including a handgun and coffee filters containing trace amounts of ephedrine, an essential ingredient in creating methamphetamine. Sometime during the night, officers briefly entered an apartment at the 108 Union Street address with the assistance of Ambrose's mother, who had a key. Their informant had told them the person living there may have overdosed on methamphetamine and be in need of emergency medical assistance. They knocked on what they believed was the person's door, but no one answered. Upon hearing the commotion, a neighbor opened his door and told the officers he had not seen the occupant in a few days. The officers relayed their concern to Ambrose's mother, who retrieved a key and let the officers in. No one was there, so the officers left. One officer also briefly looked in a nightstand in Ambrose's apartment for a key to a vending machine in the garage. No contraband was found or seized from any area other than the garage. Evidence seized from the garage, including the handgun, was offered against Ambrose at trial.

2.

Ambrose makes three suppression-related arguments on appeal: (1) the search warrant's deficiency under state law rendered the search warrantless, in violation of the Fourth Amendment; (2) the warrant's affidavit contained false information critical to the finding of probable cause; and (3) all seized evidence should have been suppressed because the officers searched in places not authorized by the warrant. When reviewing a district court's ruling on a motion to suppress, we review its factual findings for clear error and its legal conclusions de novo. *United States v. Archibald*, 589 F.3d 289, 294 (6th Cir. 2009). We may affirm the ruling on any ground supported by the record. *United States v. Gill*, 685 F.3d 606, 609 (6th Cir. 2012).

a.

Tennessee Rule of Criminal Procedure 41(d) requires that a magistrate issuing a search warrant prepare an original and two exact copies of the warrant. There is no dispute here that the search warrant did not comply with this requirement, as only one copy bore Judge Cupp's signature. The government concedes that this procedural defect

would require suppression in a state prosecution.  *See State v. Steele*, 894 S.W.2d 318, 319 (Tenn. Crim. App. 1994).  We consider whether suppression is similarly required in a prosecution in federal court.

"The commonly-held position is that federal, not state, law governs the question of the validity of a [state-issued] search warrant in a federal criminal proceeding." *United States v. Shields*, 978 F.2d 943, 945 (6th Cir. 1992); *accord United States v. Clyburn*, 24 F.3d 613, 614 (4th Cir. 1994) ("[T]he validity of a search warrant obtained by state officers is to be tested by the requirements of the Fourth Amendment of the U.S. Constitution, not by state law standards, when the admissibility of evidence in federal court is at issue.").  Similarly, "in federal court, [the exclusionary rule] only requires the court to exclude evidence seized in violation of the Federal Constitution." *United States v. Wright*, 16 F.3d 1429, 1434 (6th Cir. 1994).  That is because the exclusionary rule "emanates from the Fourth Amendment, not state law[.]" *Id.*  While the states are free to impose rules for searches and seizures that are more restrictive than the Fourth Amendment, those rules will not be enforced in a federal criminal proceeding.  *Id.* Therefore, "[i]n determining whether evidence obtained solely by state officers is admissible in federal court in the first instance, it is usually irrelevant whether a state rule of criminal procedure was violated." *United States v. Maholy*, 1 F.3d 718, 721 (8th Cir. 1993); *see also Virginia v. Moore*, 553 U.S. 164, 178 (2008) (noting that "it is not the province of the Fourth Amendment to enforce state law").  This rule "promotes uniformity in federal prosecutions." *Wright*, 16 F.3d at 1437.

Although no court to our knowledge has before addressed the precise question raised here, we find that the answer is squarely governed by the rule that *only* the Fourth Amendment (to the exclusion of state law) applies in federal prosecutions involving evidence seized by state officials.  So long as the Fourth Amendment is satisfied, there is no basis for suppression.  Accordingly, we turn to the Fourth Amendment, which requires "only three things" with respect to search warrants. *Dalia v. United States*, 441 U.S. 238, 255 (1979).  The first is that they be issued only by "neutral and detached" magistrates "capable of determining whether probable cause exists for the requested

arrest or search." *Shadwick v. City of Tampa*, 407 U.S. 345, 350 (1972); *see Johnson v. United States*, 333 U.S. 10, 14 (1948) ("[The Fourth Amendment's] protection consists in requiring that . . . inferences [of probable cause] be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."). There is no dispute that Judge Cupp satisfied these criteria when he authorized the search of Ambrose's garage.

The second requirement is that search warrants issue only upon a finding of "probable cause." U.S. Const. amend. IV. We address this issue separately below and assume for present purposes that it was satisfied. The final requirement is that search warrants "particularly describ[e] the place to be searched, and the . . . things to be seized." *Id.*; *see Maryland v. Garrison*, 480 U.S. 79, 84–85 (1987). There is similarly no dispute that the warrant met this requirement. Because the Fourth Amendment requirements for warrants were met in this case, the district court properly rejected Ambrose's request for suppression on the basis of an invalid search warrant.

Ambrose seeks to transform the warrant's defect under state law into a constitutional violation by arguing that a state judge who does not comply with state requirements when approving a search warrant never "issues" the warrant, thereby making any resulting search warrantless and therefore unconstitutional. A similar situation arises when a state magistrate, in violation of state rules, relies upon unwritten (though sworn) statements from an officer to find probable cause for a search warrant. Suppression in such instances is not required in federal proceedings (for there is no Fourth Amendment violation) even though it would be required were the defendant being prosecuted in state court, *solely* on account of the state-law violation. *See United States v. Parker*, 4 F. App'x 282, 284 & n.2 (6th Cir. 2001); *Shields*, 978 F.2d at 945–46; *accord Clyburn*, 24 F.3d at 616–17; *see also Maholy*, 1 F.3d at 721 (holding that an officer's noncompliance with a state rule of procedure requiring "reasonable cause" for a nighttime search warrant is "irrelevant to determining, at least in the first instance, whether the fruits of the search are admissible in federal court"). This reasoning applies with the same force to noncompliance with a state rule that requires a magistrate to sign

a certain number of copies of the warrant—it matters not in a federal proceeding; the warrant is not any less "issued."  Had Judge Cupp failed to sign *any* copy of the warrant, it might plausibly be maintained that a warrant never issued in the first place as *a matter of fact*.  But that is not what happened here.  Judge Cupp's signature on one copy of the warrant was sufficient to satisfy the Fourth Amendment.

Nor is it problematic under the Fourth Amendment that the officers executed an unsigned copy of the warrant.  *Cf. United States v. Lipford*, 203 F.3d 259, 269–70 (4th Cir. 2000) (finding no Fourth Amendment violation where officers presented defendant with unsigned copy of search warrant before searching his home).  Doing so did not make the warrant any less "issued."

Our recent decision in *United States v. Master*, 614 F.3d 236 (6th Cir. 2010), upon which Ambrose relies, does not require otherwise.  There, the government conceded that, as a matter of state statutory law, the state judge lacked authority to issue the search warrant, which was for a residence in a neighboring county over which the judge did not preside.  *Id.* at 237–39.  We held the warrant void *ab initio*, explaining that the Fourth Amendment permits warrants to issue only after a probable-cause determination made by a neutral and detached "magistrate," a term the Supreme Court has permitted the States to define.  "The qualifications of a magistrate," we noted, "are therefore inextricably intertwined with state law," and "[s]tate law determines what person is allowed to approve what warrant."  *Id.* at 240.  We reasoned that if the States get to decide who has authority to issue warrants (provided the persons are neutral and detached and capable of determining whether probable cause exists), then they are entitled also to define the scope of that authority in any way they wish.  Because the magistrate in *Master* lacked authority under state law to issue a warrant for a search in a different county, the warrant was never issued by a "magistrate," in violation of the Fourth Amendment.  *Id.* at 241.  *See also United States v. Scott*, 260 F.3d 512, 515 & n.2 (6th Cir. 2001) (search warrant signed by a retired state judge "wholly without legal authority to issue a warrant" under state law was void *ab initio*), *overruled on other grounds by Master*, 614 F.3d at 242; *United States v. Bennett*, 170 F.3d 632, 636–37

(6th Cir. 1999) (search warrant issued by court clerk authorized by state law to do so was valid under the Fourth Amendment).

Unlike in *Master*, however, the Fourth Amendment question here is not tied to a question of state law. Judge Cupp had authority under state law to issue search warrants, and his failure to sign two copies of the search warrant did not in any way deprive him of that authority.

*United States v. Bennett*, 170 F.3d 632 (6th Cir. 1999), also does not change matters. At issue there was a search warrant issued by a state court clerk while the judges were absent. State law authorized the clerk to issue warrants in such instances. The defendant claimed the warrant was invalid due to noncompliance with Federal Rule of Criminal Procedure 41, which allows only judges to issue warrants. The contention prompted us to reaffirm that "the validity of a search warrant obtained by state officers for seizure of evidence ultimately used in a federal prosecution turns only on constitutional issues" (and not federal statutory issues), *id.* at 635, and we rejected the defendant's argument. We also stated, perhaps inartfully, that "the validity of the search warrant in this case must be tested pursuant to Kentucky criminal procedural requirements and the Constitution." *Id.* at 636. Ambrose understandably seeks refuge in our statement regarding the relevance of state law to the question of a warrant's validity for purposes of federal suppression proceedings. These two statements appear to be in conflict—the first says to consider only federal law, the second says to look also at state law. Upon a closer reading, however, they are entirely consonant.

*Bennett* asked whether the court clerk had authority to issue the search warrant. The answer to this question—the very one involved in *Master*, *supra*—turned on a matter of state law and therefore required us to consider it to answer the constitutional question. Accordingly, the statements, both correct, are consistent in the following way: the validity of a state warrant in federal proceedings does indeed turn only on constitutional issues, but because the constitutional question involved there—whether the court clerk was a neutral and detached magistrate, as required by the Fourth Amendment—depended on state law, we had to consider state procedural requirements

in order to reach an answer.  Our statement in *Bennett* regarding the consideration of state law in a federal suppression proceeding is irrelevant here, for the answer to the Fourth Amendment question does not depend upon state law.

b.

Next, Ambrose contends that the search warrant included a false statement that was necessary to establish probable cause for the search.[1]  The targeted statement concerns a check of pharmacy records purportedly performed by Major Hensley that apparently revealed that Ambrose had purchased at least ten boxes of ephedrine within the past seven days.  But even if we excise this allegedly false statement from Hensley's affidavit, we are still left with enough information to generate probable cause for the search.  *See Franks v. Delaware*, 438 U.S. 154, 156 (1978).  The following facts gave the state judge a "substantial basis" for finding "a fair probability that contraband or evidence of a crime [would] be found" in the garage, *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983):  (1) the confidential informant recently saw various illegal drugs in specific amounts in the garage; (2) Ambrose's associates recently brought him boxes of ephedrine with the purpose of manufacturing methamphetamine; (3) the informant saw glass smoking pipes and materials for making these pipes in the garage; (4) the informant saw a handgun in the garage; and (5) Ambrose was a felon and therefore not permitted to possess a firearm.

c.

In his final challenge to the search, Ambrose contends that suppression of *all* the seized evidence was necessary because the authorized search of the garage devolved into an unlawful general search of the entire building, including Ambrose's apartment, his mother's apartment, and an apartment at the 108 Union Street address. *See United States v. Lambert*, 771 F.2d 83, 93 (6th Cir. 1985) ("A flagrant disregard for the limitations of a search warrant might make an otherwise valid search an impermissible general search

---

[1]The government contends that Ambrose forfeited this argument by not objecting to the magistrate's report and recommendation.  *See United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).  It is mistaken, because Ambrose did object.  *See* R.185 at 5–6.

requiring the suppression of all evidence seized during the search."). Blanket suppression, though an extreme remedy for a Fourth Amendment violation, is nonetheless warranted when officers "flagrant[ly] disregard" the limitations on a search warrant. *Id.* The remedy is appropriate where officers "'exceed[] the scope of the warrant *in the places searched*' (rather than the items seized)." *United States v. Garcia*, 496 F.3d 495, 507 (6th Cir. 2007) (quoting *Waller v. Georgia*, 467 U.S. 39, 43 n.3 (1984)). If the search of places not authorized by a warrant satisfies an exception to the warrant requirement, however, there is no violation and no basis for blanket suppression. *See id.* (explaining that the test is "whether [the officers'] search *unreasonably* exceeded the scope of the warrant"). Although the district court acknowledged these rules and addressed some of Ambrose's allegations on this front, it did not address all of them. It thereby left us with an incomplete set of findings that must be supplemented.

Officers briefly looked in an upstairs living area where Ambrose's mother resides. They did so not for the purpose of finding contraband, but rather to ensure their safety from persons who might be hiding therein and wanting to attack them during the search of the garage. When the officers arrived at the building, they learned that the address that contained the garage and Ambrose's apartment also housed an upstairs room that connected directly to the garage by a hallway. Ambrose's wife told them there was another person upstairs. The officers already believed that drugs and at least one gun were inside the building. This knowledge allowed them to perform a brief protective sweep of the upstairs living area. *Cf. Maryland v. Buie*, 494 U.S. 325, 334–35 (1990); *United States v. Taylor*, 666 F.3d 406, 410 (6th Cir. 2012).

Officers also entered and briefly looked inside a non-adjoining apartment at the 108 Union Street address upon their belief that the occupant might be in need of immediate medical attention due to a possible drug overdose. There is absolutely no indication, however, that Ambrose had any expectation of privacy (let alone a reasonable one) in an apartment being rented by another individual. Accordingly, Ambrose lacks the ability to challenge the officers' brief entry into the room. *See Rakas v. Illinois*,

439 U.S. 128, 140 (1978); *United States v. King*, 227 F.3d 732, 743–44, 751 (6th Cir. 2000).

During the search of the garage, officers observed a locked vending machine that they wished to open and search. Rather than destroy the machine, they asked Ambrose whether he had a key to it. He responded by giving the officers consent to look for the key in his vehicle and in a nightstand in his apartment. An officer went to the apartment and advised Mrs. Ambrose of her husband's consent and looked inside a nightstand for the key with her assistance (and without any objection). The district court's finding that Ambrose gave consent to this limited search of his nightstand is not clearly erroneous. *See United States v. Collins*, 683 F.3d 697, 701–02 (6th Cir. 2012).

Three other aspects of the search may be more troublesome. We say "may" because the district court did not fully address them, so we lack the findings necessary to determine whether blanket suppression is warranted. They all involve the entry and search of Ambrose's apartment apart from the nightstand search. First, officers testified that when they knocked on Ambrose's apartment door in their attempt to secure consent to search the garage, R.176 at 186–87, Mrs. Ambrose opened it and freely let them in. R.176 at 43 ("[W]e asked if we could come in, she invited us in."), 65 ("I told her who we were, identified ourselves, told her why we were there. She invited us in, told us to come in[.]"). The officers then walked through the apartment and into the hallway that leads to the garage. *Id.* at 43–44. According to Mrs. Ambrose, the officers entered her apartment without asking. *Id.* at 105. In fact, she asked to get dressed before they came in, but the officers said "no," pushed open the door, and came in anyway. *Id.* at 105–06. She said she never invited them in or otherwise gave consent for them to enter. *Id.* at 109–10. The district court did not address this entry, so it never determined which version of the facts to believe.

Second, Major Hensley and Ronnie Adkins, Chief Investigator for the Unicoi County Sheriff's Department, both testified that they searched Ambrose's apartment at his wife's request. *Id.* at 46–47, 51, 69–70. According to both officers, when they explained to Mrs. Ambrose the basis for their search of the garage, she became

concerned for her own and her young child's safety and asked the officers to "look around" her apartment for toxic items related to methamphetamine. They did so and found nothing of concern. *Id.* Mrs. Ambrose flatly denies asking officers to search her apartment. *Id.* at 109, 113–14. This dueling testimony was never resolved by the district court, so there is no finding whether or not Mrs. Ambrose consented to the search of the apartment.[2]

Finally, Ambrose's mother and sister testified that they watched officers search Ambrose's apartment *after* Mrs. Ambrose left to take her son to the hospital. *Id.* at 117–18, 124–25, 131. His mother saw officers take the mattress off the bed and rummage through dresser drawers. *Id.* at 118. Mrs. Ambrose corroborated this testimony, stating that it appeared her apartment had been thoroughly searched—her mattress was out of place, clothes were on the floor, and dresser drawers were left open. *Id.* at 110. The officers, however, testified to the contrary. *Id.* at 71 (Q. Okay. You did not search that apartment where the young lady was? A. Only the area that she requested."). This second alleged search of the apartment also was not addressed below.

In the absence of necessary findings, a remand is required for the limited purpose of the district court making further findings on these unresolved matters regarding Ambrose's apartment (initial entry, search allegedly at Mrs. Ambrose's request, second search in Mrs. Ambrose's absence). We nevertheless will address the remaining issues raised in Ambrose's appeal and the government's cross-appeal and will assume for such purposes that the search did not unreasonably exceed the scope of the warrant. In the event the district court determines the officers exceeded the warrant's scope, it should determine whether blanket suppression is warranted and, if so, how suppressing all of the evidence affects Ambrose's convictions and sentence. Either party may then appeal from the new judgment.

---

[2]The district court sidestepped the issue of consent by finding that the officers entered the apartment only for the purpose of looking for other persons and thus never truly searched the apartment. But no officer testified that they swept the apartment for persons. Rather, they testified that they *searched* the apartment for methamphetamine-related materials and did so only at Mrs. Ambrose's request. R.176 at 46–47, 67, 69–70, 71. Officer Ronnie Adkins said he briefly looked in an attic area inside the apartment to make sure no one was hiding there. But that was only *after* he and Hensley searched the apartment for methamphetamine. *Id.* at 70–71.

C.

In his next claim of error, Ambrose contends that the district court erred by not ordering the government to disclose the identity of a confidential informant whose statements to police gave rise to the search of Ambrose's garage.  The following exchange took place between Ambrose's counsel and an investigating officer:

Q.  Now you indicated that an informant had told you that there was a pistol in that garage, right?

A.  Yes, Sir.

Q.  Who is that informant?

MS. HEBETS:  Objection, Your Honor, as to relevance.

Q.  Your Honor, I may want to call that informant.  I don't think it's irrelevant at all.

MS. HEBETS:  Your Honor, I think Mr. Smith needs to lay more groundwork if he wants to call that witness.  I'm not sure what difference it makes.  A weapon was found in the garage.

Q.  Your Honor, as the Court knows, during the course of suppression hearings and things like that an informant is not disclosed.  Now we're talking about permitting hearsay evidence of an informant and not permitting me to know who that informant is and to call them.  I'd ask again to ask the Court to direct him to tell us who his informant was.

THE COURT:  Well, at this point the question is, the informant had reported that the gun was located there?

Q.  Yes, Sir.

THE COURT:  And the Sheriff found the gun there?

Q.  That's right.

THE COURT:  Alright. Let's leave it at that.

Q.  Did your informant ever describe to you what type of pistol?

A.  He did, yes.

Q.  Okay. And what did your informant tell you?

MS. HEBETS:  Objection, hearsay, relevance.

THE COURT:  (INAUDIBLE) the informant.

Q. Your Honor, I'd like to have the informant's name.

THE COURT:  I don't believe that it's necessary.

Q. Would the Court like me to move on, Your Honor?

THE COURT:  Yes.

In *Roviaro v. United States*, 353 U.S. 53 (1957), the Supreme Court recognized the government's limited privilege to "withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." *Id.* at 59.  However, "[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id.* at 60–61. In making the determination, trial courts must balance the public's interest in protecting the flow of information against the defendant's right to prepare a defense.  "Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case," including, among other relevant factors, "the crime charged, the possible defenses, [and] the possible significance of the informer's testimony[.]" *Id.* at 62.  We review a district court's decision on the matter for an abuse of discretion. *United States v. Jenkins*, 4 F.3d 1338, 1341 (6th Cir. 1993).

The district court was within its discretion to allow the government to withhold the identity of its confidential informant.  Ambrose failed to show that disclosure was "essential to a fair trial." *United States v. Moore*, 954 F.2d 379, 381 (6th Cir. 1992). Indeed, Ambrose has not demonstrated how disclosure would have assisted him in *any* way.  He attempts to compare his situation to *Roviaro*, where the Supreme Court found reversible error in not ordering disclosure.  The defendant in that case was charged with facilitating the transportation of drugs while knowing they were imported illegally. *Roviaro*, 353 U.S. at 63.  An informant drove to a location and was later met by the defendant, who got into the car before the two drove off.  The car later stopped, and the defendant got out, retrieved a small package from behind a tree, gave it to the informant, and walked away. *Id.* at 57.  The Court found the charged offense "so closely related to [the informant] as to make his identity and testimony highly material" and potentially

helpful to the defense. *Id.* at 63–64. Central to the Court's decision was that the statute did not proscribe mere drug possession, and that the only material witness, apart from the defendant, was the informant, who was in the car with the defendant and may have disputed testimony from the government agents who witnessed the transaction from a distance. The informant might have established entrapment or the defendant's potential lack of knowledge regarding the package's contents. *Id.* at 64.

Here, by contrast, the only role the confidential informant played was supplying reliable information to police that led to a fruitful search. The informant did not orchestrate or involve himself in any controlled methamphetamine purchases, supply Ambrose with pseudoephedrine, or sell or lend Ambrose the handgun later found in the garage. The informant helped orchestrate *the search* that led to discovery of incriminating evidence, not the crimes themselves. Accordingly, the informant could not testify to any relevant fact, and the district court was therefore within its discretion not to order disclosure.

D.

Finally, Ambrose challenges the sufficiency of the evidence on his conspiracy and firearm convictions.

1.

With respect to his challenge to the drug-conspiracy convictions, Ambrose makes the same arguments Beals made regarding single-versus-multiple conspiracies. For the reasons stated in our rejection of Beals's challenge, the evidence permitted the jury to find the existence of the single conspiracy alleged in the indictment and that Ambrose joined this conspiracy.

2.

Ambrose also challenges the sufficiency of the evidence that he possessed a firearm in furtherance of a drug trafficking crime. *See* 18 U.S.C. § 924(c). Specifically, he argues that the evidence is insufficient with respect to the "in furtherance of" element

of the offense, which requires that the firearm be possessed to "advance, promote, or facilitate" the underlying criminal activity. *United States v. Paige*, 470 F.3d 603, 609 (6th Cir. 2006).

"[T]he possession of a firearm on the same premises as a drug transaction would not, without a showing of a connection between the two, sustain a § 924(c) conviction." *United States v. Mackey*, 265 F.3d 457, 462 (6th Cir. 2001). "In order for the possession to be in furtherance of a drug crime, the firearm must be strategically located so that it is quickly and easily available for use." *Id.* "[P]ossession of a wall-mounted antique or an unloaded hunting rifle locked in a cupboard[,]" for instance, would not satisfy the statute. *Id.* The evidence in *Mackey* showed an illegally possessed and loaded short-barreled shotgun located in the living room of a crack house. It was easily accessible to the defendant and was placed next to drug scales and razor blades. The defendant was arrested near the gun and was in possession of cocaine and a large sum of cash. We found that a jury could find that the firearm's purpose was to "provide defense or deterrence in furtherance of the drug trafficking for which the defendant was arrested." *Id.* at 462–63; *see also Paige*, 470 F.3d at 609–10 (evidence sufficient where two loaded guns were found under a couch cushion in a residence where crack was being sold throughout the day and night and where officers found crack, $900 cash, and digital scales dusted in cocaine residue).

Here, the evidence was sufficient for a jury to conclude that Ambrose possessed the .22-caliber handgun in furtherance of a drug trafficking crime. When officers searched his garage, they found the loaded handgun wrapped in a cloth sitting on a shelf in the open. Although Ambrose's father testified that *he* owned the gun, ownership is different from possession—one can possess a gun without owning it. Ambrose worked daily in the garage, a place where others met him on occasion to exchange drugs and drug-making materials. The evidence also showed that the garage was used as a "pill-washing station," *i.e.*, a location used in the early stages of making methamphetamine to separate pseudoephedrine from the remaining substances in cold-medicine pills. Officers found wet coffee filters containing ephedrine residue in the trash can in the

garage during the search.  Although Ambrose's father testified that he put the gun on the garage shelf with the intent of repainting it at some point but never got around to it, that does not reasonably explain why the gun was loaded when it was found.  Nor was the jury required to believe Ambrose's father's testimony.  Furthermore, Baucom testified that Ambrose used a gun (though not necessarily *this* gun) in the past to rob him of a gun, cash, and drug-making materials.  He also testified that he bought "a couple" of guns from Ambrose in the past.  The jury was permitted to use this evidence to conclude that Ambrose used guns to "advance, promote, or facilitate" his drug-trafficking enterprise, increasing the likelihood that the handgun found in the garage was used in the same manner.

## E.

For these reasons, we affirm Ambrose's convictions on the assumption that the evidence seized from his garage was properly admitted at trial.  We remand the matter to the district court for the purpose of making the necessary factual findings identified above.

### IV.  Government's Cross-Appeal (No. 10–6084)

The government appeals Ambrose's sentence, arguing that it has since become unlawful in light of an intervening Supreme Court case decided during this appeal.

Ambrose was sentenced to 168 months' imprisonment, among other punishments.  He is subject to a mandatory minimum sentence of ten years on each of the two drug-conspiracy convictions on account of the weight involved.  *See* 21 U.S.C. § 841(b)(1)(A)(viii).  The government asserts that he is subject also to a mandatory minimum sentence of five years for his conviction under § 924(c) that must run consecutive to the ten-year sentences, resulting in a mandatory minimum prison sentence of fifteen years (180 months).  *See* 18 U.S.C. § 924(c)(1)(A)(i), (D)(ii).  The government concedes, however, that this mandatory minimum sentence was prohibited by our precedent at the time Ambrose was sentenced, precedent the district court dutifully followed when imposing the sentence.  *See United States v. Almany*, 598 F.3d 238,

241–42 (6th Cir.) (holding that a defendant convicted under § 924(c) who is already subject to *any* mandatory minimum greater than the one required by § 924(c) is not subject also to a mandatory, consecutive sentence for the § 924(c) conviction), *judgment vacated*, 131 S. Ct. 637 (2010) (mem.).  The sentence was lawfully imposed.

However, while this appeal was pending, the Supreme Court decided *Abbott v. United States*, 131 S. Ct. 18 (2010).  The Court there held, directly contrary to *Almany* (and the district court here), that a defendant convicted under § 924(c) is subject to the highest mandatory minimum specified in that statute unless another statutory provision directed to the very conduct § 924(c) proscribes—*i.e.*, using, carrying, or possessing a firearm in connection with a crime of violence or a drug-trafficking crime—requires a higher mandatory minimum.  *Id.* at 23, 29.  Both parties agree that *Abbott* covers Ambrose's conviction under § 924(c).  Because the district court declined to impose a consecutive minimum sentence of five years for the conviction, Ambrose's sentence is now unlawful, and he must be resentenced.  *Cf. United States v. Taylor*, 666 F.3d 406, 411 (6th Cir. 2012).

Ambrose makes two arguments in an attempt to avoid this result; both are unconvincing.  He first asserts that the government somehow forfeited its challenge to Ambrose's sentence by failing to argue, both here and below, that the sentence is "unreasonable" or that the district court otherwise "abused its discretion."  Initially, claims that a sentence is unreasonable or resulted from an abuse of discretion are *appellate* arguments, so the government was not required to make them before the district court.  *United States v. Vonner*, 516 F.3d 382, 389 (6th Cir. 2008) (en banc).  In any event, the government *did* argue at sentencing that *Almany* was wrongly decided.  And it has properly argued before us that the sentence is unlawful in light of *Abbott*.  That is sufficient.

Ambrose next contends that subjecting him to a mandatory, consecutive sentence of five years would violate concepts that underlie the *Ex Post Facto* Clause of the United States Constitution.  *See* U.S. Const. Art. I, § 9, cl. 3 ("No . . . ex post facto Law shall be passed.").  Although that clause by its terms applies only to *legislative* enactments,

the Supreme Court has recognized that the Fifth Amendment's Due Process Clause provides similar protections with respect to retroactive application of judicial interpretations of criminal statutes that are "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." *Rogers v. Tennessee*, 532 U.S. 451, 461 (2001) (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964)). Due process entitles persons to "fair warning" that criminal liability will attach to what previously had been lawful conduct. *Id.* at 459–60. We have held that concepts of "fair warning" protect individuals also from *ex post* applications of unforeseeable judicial expansions of the *punishments* that result from a conviction, a protection embodied in the *Ex Post Facto* Clauses themselves as interpreted by the Supreme Court, *see Weaver v. Graham*, 450 U.S. 24, 28 (1981). *See Dale v. Haeberlin*, 878 F.2d 930, 934 (6th Cir. 1989).

Here, Ambrose contends that the Supreme Court in *Abbott* interpreted § 924(c) "directly contrary" to its plain language, thereby depriving him of fair warning of his potential punishment. Even assuming the continued validity of our view that due process protects against unforeseen judicial expansion of *the punishments* for known criminal conduct (as opposed to *the conduct* proscribed), *see Webb v. Mitchell*, 586 F.3d 383, 392 (6th Cir. 2009) (potentially calling *Dale* into doubt on this point in light of *Rogers v. Tennessee*, 532 U.S. 451 (2001)), Ambrose's position that he lacked fair warning is difficult to reconcile with the *unanimous* views of the Justices in *Abbott* that the statute *unambiguously* required a consecutive five-year sentence for those in Ambrose's position, *Abbott*, 131 S. Ct. at 31 n.9, and that the government's contrary position "gives effect to the statutory language," *id.* at 29. Further, Ambrose is unable to point to one decision in existence at the time he committed the offense that favored his reading of the statute, thus making his claimed lack of fair warning less availing. *Cf. Bouie*, 378 U.S. at 356–57. (The first to go his way was *United States v. Whitley*, 529 F.3d 150 (2d Cir. 2008), decided one month *after* he committed the offense.)

Finally, Ambrose asks us to apply the rule of lenity, which "requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United*

*States v. Santos*, 553 U.S. 507, 514 (2008).  But given that the Supreme Court in *Abbott* found § 924(c) *unambiguous* and declined to afford lenity in that case, we see no basis for doing so here.  *Abbott*, 131 S. Ct. at 31 n.9.  For these reasons, Ambrose's current sentence is unlawful, and he must be resentenced consistent with *Abbott* (assuming, of course, that his § 924(c) conviction survives the district court's further factfinding regarding the search).

V.

For these reasons, we **DISMISS** Miller's appeal (Appeal No. 10–5432), **AFFIRM** Beals's convictions (Appeal No. 10–5264), **VACATE** Ambrose's sentence, and **REMAND** Ambrose's case to the district court for proceedings consistent with this opinion (Appeal Nos. 10–5877 and 10–6084).

---

**CONCURRENCE**

---

TARNOW, Senior District Judge, concurring.  While I agree with the Court's outcome, I write separately to note several troubling issues in Appellant Miller's case.

As noted by the Court, the law is clear that "defendants may waive their right to appeal as part of a plea agreement so long as the waiver is made knowingly and voluntarily." *United States v. Swanberg*, 370 F.3d 622, 625 (6th Cir. 2004).  The majority finds that Miller "does not contend that her plea was unknowing . . . ."  Instead, Miller argues that the waiver provision was not intended to cover a situation such as her current appeal, or that the government breached the plea agreement.

Because a plea agreement constitutes an agreement whereby a defendant gives up their freedom to contest criminal charges, plea agreements create "special due process concerns for fairness and the adequacy of procedural safeguards . . . ." *United States v. Ready*, 82 F.3d 551, 558 (2d Cir. 1996) (internal citations omitted).  Plea agreements "are to be interpreted strictly, with ambiguities construed against the government." *United States v. Caruthers*, 458 F.3d 459, 470 (6th Cir. 2006) (citations omitted).  In this case, Miller's plea agreement contained a waiver of appeal unless her eventual sentence was "above the sentencing guideline range as determined by the district court."  The Court finds, and I agree, that based on language of her waiver, Miller's eventual sentence was not above the guidelines range as determined by the district court - though the district court's determination of the guidelines range was contrary to the stipulated facts in her plea agreement.

The Court holds that Miller "could have bargained" for a narrower waiver, for instance by including language that she reserved the right to appeal whether "the Court incorrectly determined the guidelines range."  The Court thus implies that Miller consciously chose to forego a more narrow waiver for some unstated advantage, or that she was simply deficient in her bargaining and unnecessarily exposed herself to the possibility of a higher sentence.

My point is not to question the Court's holding that Miller's waiver was knowing and voluntary, but rather to note that requiring sophisticated bargaining by criminal defendants to retain the right to appeal a sentence likely contributes to uncertainty regarding whether a plea was knowing or voluntary. It does not seem to me that justice is served by permitting plea agreements that (bargaining aside) result in defendants agreeing to a plea that they did not intend or properly understand. Moreover, defendants may have less incentive to accept guilty pleas if they are concerned that they are actually at risk of a higher sentence than they thought had been agreed to in their plea agreement.

I would recommend that counsel for both defendants and the government strive to create plea agreements that state in plain terms the maximum possible sentence a defendant might receive.[1] Defendants who plead guilty based on an agreement that provides a clear statement of the maximum likely sentence are adequately forewarned of the possible consequences of their guilty plea, even in a "worst case" scenario where, as here, a court construes the evidence and sentencing guidelines differently than a defendant expected when agreeing to their plea.

If discussion of the maximum possible sentence is required in plea agreements the result is to eliminate ambiguity in the guilty-plea process, surely an important goal given the interests at stake. In *United States v. Shedrick*, 493 F.3d 292, 299-300 (3d Cir. 2007), the court found that a guilty plea was knowingly made in part because the agreement explicitly stated that the defendant faced a maximum potential sentence of ten years' incarceration. The district court also discussed the maximum sentence during the plea colloquy. The defendant could therefore not complain that he was unaware of the consequences of his plea. In *United States v. Williams*, 198 F.3d 988, 993 n.1 (7th Cir. 1999), the court found that, if an explicit stipulation was made as to the maximum sentence, the district court should have rejected a plea agreement during the plea colloquy where a mutual mistake of fact was present in the plea agreement as to the maximum possible sentence. As a result of the mutual mistake, the United States Court

---

[1] A judge is not bound by stipulations in plea agreements and may independently determine the facts relevant to sentencing.  U.S.S.G. § 6B1.4(d).

of Appeals for the Third Circuit affirmed the district court's decision to allow the defendant to withdraw his plea of guilty.

As another example of such a system in operation, 10 U.S.C. § 845(a), which discusses plea agreements in the Uniform Code of Military Justice, states that "if it appears that [the defendant] has entered the plea of guilty improvidently or through lack of understanding of its meaning and effect, or if he fails or refuses to plead, a plea of not guilty shall be entered in the record . . . ." Military courts have found that "a substantial misapprehension of the maximum sentence may vitiate the providence of a plea of guilty." *United States v. Walls*, 9 M.J. 88, 90-91 (C.M.A. 1980). Thus, most plea agreements in military courts contain a provision concerning the maximum possible sentence, without which a defendant cannot providently plead guilty.

The plea agreement in this case does not mention the actual maximum possible sentence that Miller might have (and did) receive. While a stipulation in a plea agreement cannot bind a sentencing court to a particular sentence, plea agreements should state the maximum possible sentence that a defendant might receive and, if subjected to a sentence above that maximum, waivers of appeal should not be enforced.