NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0459n.06

Case No. 22-5951

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED**<br>Nov 02, 2023<br>KELLY L. STEPHENS, Clerk |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| | ) | |
| | ) | |
| ANTHONY HARRIS, | ) | |
| Defendant-Appellant. | ) | |
| | ) | O P I N I O N |

Before: McKEAGUE, READLER and DAVIS, Circuit Judges.

STEPHANIE DAWKINS DAVIS, Circuit Judge. Anthony Harris discharged a firearm inside a hotel room where he and two other people were present. His conduct led to a guilty plea to a felon-in-possession charge and a 66-month sentence. He now appeals the sentence, challenging the district court's inclusion of a sentencing enhancement for possessing a firearm in connection with another felony offense. The presentence investigation report ("PSR") recommended a four-level enhancement under U.S.S.G. § 2K2.1(b)(6)(B) for wanton endangerment under Kentucky law. Over Harris's objection, the district court applied the enhancement and sentenced Harris within the resulting advisory guideline range of 57 to 71 months' imprisonment. Harris argues that the district court made erroneous factual findings and misconstrued the law in determining that Harris's conduct amounted to wanton endangerment under Kentucky law. We conclude that the district court did not clearly err in its factual findings

and properly applied the Sentencing Guidelines. We therefore **AFFIRM** the district court's judgment.

I.

*Background.* On August 23, 2021, Lexington Police dispatched officers to the Red Roof Inn after receiving a 911 call reporting that a gunshot was fired by someone in Room 328. Officers arrived and determined that an occupant in Room 328, later revealed to be Harris, was in possession of a firearm. For over 20 minutes, officers attempted to coax Harris out of the hotel room, but he refused to surrender and continued to drink alcohol. During this standoff, officers observed Harris acting erratically in the window—brandishing a gun and sometimes pointing it to his head. Due to Harris's behavior, officers took measures to evacuate the rooms close to Room 328. They were unable, however, to evacuate a family from the room immediately next to Harris's and instead required the group to shelter in place. After speaking with the commanding SWAT team officer, Harris finally exited the hotel room with his hands visible, only to quickly return to his room. Shortly after that, Harris left the room a second time—showing his hands; officers quickly discharged their tasers to temporarily immobilize and apprehend him. Harris continued to behave erratically with the officers and medical staff until he was eventually sedated.

Harris was charged in a two-count indictment with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and being a prohibited person in possession of a firearm in violation of 18 U.S.C. § 922(g)(9), based on prior domestic violence convictions. He pleaded guilty to the felon-in-possession charge pursuant to a plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(B), and the court dismissed the prohibited-person count. The plea agreement ("the Agreement") included recommended Guidelines calculations that were not binding on the district court. Relevant here, the Agreement included a government

recommendation to apply an enhancement under § 2K2.1(b)(6)(B) and a provision permitting Harris to reserve his right to challenge the enhancement.

To support application of the § 2K2.1(b)(6)(B) enhancement, the government presented the testimony of two witnesses at sentencing. Sergeant Tim Graul of the Lexington Police Department and Special Agent Megan Knotts of the Bureau of Alcohol, Tobacco, Firearms and Explosives both interviewed Sandra Toomey, the hotel housekeeper who was present in Room 328 when the weapon discharged. Toomey also witnessed some of Harris's conduct leading up to law enforcement officers' arrival on the scene. Both Graul and Knotts testified that Toomey told them that prior to the 911 call, she and Melissa Wiley, Harris's fiancée, were in the room having a discussion while Harris was either cleaning or clearing a green 9-millimeter Taurus handgun. Wiley corroborated this portion of the account during an interview with Sergeant Graul shortly after Harris's arrest and during her testimony at sentencing. Apparently influenced by the alcohol or disturbed by the stress of a court appearance earlier that day, Harris had become agitated by something Toomey said and discharged the firearm into the ceiling. According to Toomey (as recounted by Knotts), Harris began "waving the gun around the room, at times pointing the gun in her … and Ms. Wiley's direction, as well as in the direction of other hotel rooms." (R. 45, PageID 181–82; *see also id.* at 190). Though Wiley disputed that Harris was waving the gun, it is undisputed that it eventually discharged. Neither Toomey nor Wiley stated that they believed the discharge was intentional, but Toomey was concerned enough that she reported the incident to hotel management, and they called 911.

Like the government's recommendation in the plea agreement, the PSR also recommended a four-level enhancement pursuant to U.S.S.G. § 2K2.1(b)(6)(B) for possessing the firearm in connection with another felony offense—specifically wanton endangerment in the first degree, a

Class D felony offense under Kentucky law. *See* Ky. Rev. Stat. § 508.060. Harris objected to the enhancement, claiming that the gun discharged accidentally while he was trying to unload it; therefore, his actions did not meet the definition of wanton endangerment. However, citing the evidence of Harris's behavior before and during his arrest, the district court overruled the objection, applied the enhancement, and found that regardless of whether he intentionally fired the shot, Harris "wantonly engaged in conduct which created a substantial danger of death or serious physical injury to others." *See id.* On appeal, Harris challenges the district court's factual findings supporting the enhancement and denies that his conduct amounted to wanton endangerment. Harris also argues that the district court's reliance on Toomey's witness account as relayed by Graul and Knotts violated his due process rights because her statements were "unsworn" and "uncorroborated." (Dkt. 29, Page 24).

## II.

*Standard of Review*. A challenge to a district court's calculation of a defendant's Guidelines range is a question of procedural reasonableness. *United States v. Seymour*, 739 F.3d 923, 929 (6th Cir. 2014). There is debate in our case law regarding the standard for reviewing a district court's application of the § 2K2.1(b)(6)(B) enhancement. *See United States v. Taylor*, 648 F.3d 417, 430–31 (6th Cir. 2011). Although we generally review a district court's Guidelines calculations factual findings for clear error and its legal conclusions de novo, the discussion in *United States v. Shanklin* guides us that "in the specific context of the § 2K2.1(b)(6)(B) firearm enhancement, we review the district court's factual findings for clear error and accord due deference to the district court's determination that the firearm was used or possessed in connection with the other felony, thus warranting the application of the enhancement." 924 F.3d 905, 919 (6th Cir. 2019) (cleaned up); *see also United States v. Ennenga*, 263 F.3d 499, 502 (6th Cir. 2001)

(citing *Buford v. United States*, 532 U.S. 59, 66 (2001)) (clarifying that such fact-specific inquiries require a more deferential standard of review).  Cases applying this standard tend to involve challenges to whether the nexus requirement of § 2K2.1(b)(6)(B) has been met.  *Shanklin,* 924 F.3d at 919 (quoting *Taylor*, 648 F.3d at 431) ("[W]hen a defendant 'challenges the district court's determination that the firearm was used or possessed "in connection with" the [other felony offense]—i.e., that there was a nexus between the firearm and the felony—,' that inquiry is necessarily 'fact-specific' and thus better examined by the district court.").  Nexus is not at issue here.  Harris instead challenges whether his conduct constitutes the "[other] felony offense" of first-degree wanton endangerment under Kentucky law.  § 2K2.1(b)(6)(B), cmt. n.14(A).  Regardless, the resolution of this standard of review question in this instance need not be determined here because Harris's claims fail under any appropriate standard of review.

III.

*Wanton Endangerment*.  Harris argues that because the firearm's discharge was "accidental" and he only "fired a single shot," the district court erred by enhancing his sentence for wanton endangerment.  (Dkt. 29, Pages 21, 25).  Under Kentucky law:

> A person is guilty of wanton endangerment in the first degree when, under circumstances manifesting extreme indifference to the value of human life, he wantonly engages in conduct which creates a substantial danger of death or serious physical injury to another person.

Ky. Rev. Stat. § 508.060(1).  Further, wanton conduct occurs when a person is "aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists," and disregarding the risk constitutes a "gross deviation from the standard of conduct" of a reasonable person in the same situation.  Ky. Rev. Stat. § 501.020(3); *see also United States v. Clark*, 458 F. App'x 512, 516 (6th Cir. 2012).  To show that the firearm has a connection with the other felony offense under wanton endangerment, reviewing courts consider not only the

defendant's behavior, but the proximity of others when a gun is discharged. *See United States v. Kelley*, 585 F. App'x 310, 312–13 (6th Cir. 2014) (per curiam) (Statutory elements were satisfied when a defendant fired a gun multiple times in the air "in the immediate vicinity" of others while intoxicated and engaged in an argument). This court in *Kelley* explored the contours of first degree wanton endangerment involving firearms by looking to the Kentucky Supreme Court's decision on wanton endangerment in *Swan v. Commonwealth*, 384 S.W.3d 77 (Ky. 2012). *Id.* at 313. *Swan* recognized that "[f]iring a weapon in the immediate vicinity of others is the prototype of first-degree wanton endangerment. This would include the firing of weapons into occupied vehicles or buildings." *Swan*, 384 S.W.3d at 102–03 (quoting Robert G. Lawson & William H. Fortune, *Kentucky Criminal Law* § 9–4(b)(2), at 388 n.142 (1998)).

Here, the district court relied on information contained in the PSR and presented at sentencing to support its finding of wanton endangerment: (1) Harris had been drinking and was exhibiting erratic behavior before the shot was fired; (2) the firearm Harris was handling was both loaded and chambered; (3) Toomey and Wiley were inside the room with him when he discharged the gun; (4) both women described Harris's mood as disgruntled while he was handling a green firearm; and (5) this same weapon fired a round into the ceiling. Harris continued his erratic behavior even after he fired the gun by refusing to surrender to law enforcement, brandishing the gun in the window, and pointing it to his head. Finally, when officers searched Room 328 they recovered a loaded green and black Taurus 9-millimeter handgun as well as a spent shell casing on the floor, and they observed a bullet hole in the ceiling. Assessing the totality of the evidence, the court concluded that regardless of his level of intoxication, Harris discharged the firearm without regard for human life. The district court explained that Harris "might not have been intending to kill anybody, [but] he was handling that gun in a way that he could have killed

someone given the kinds of behavior that he was exhibiting." (R. 45, PageID 219). Reviewing the district court's conclusion and application of the four-level enhancement, we agree.

Harris does not dispute the fact that he was acting erratically. And he cannot dispute that two other people were nearby inside the same room when the shot was fired. On top of that, the room next door was occupied by a family that was forced to shelter in place. The district court did not clearly err in crediting these facts and Harris cannot reconcile these facts with case law that supports a finding of wanton endangerment when a firearm is discharged "in close proximity" to others. *See United States v. Sweat*, 688 F. App'x 352, 354–55 (6th Cir. 2017) (sentencing enhancement for wanton endangerment upheld where a firearm discharged in the vicinity of an adult and a child, noting "it was irrelevant that the defendant did not target those he endangered"); *Combs v. Commonwealth*, 652 S.W.2d 859, 860–61 (Ky. 1983) (where a firearm discharged near two employees but did not hit either of them); *Smith v. Commonwealth*, 410 S.W.3d 160, 166–66 (Ky. 2013) (where a firearm discharged in the direction of a husband and child only a few feet away); *Kelley*, 585 F. App'x at 312 (where a firearm discharged in a densely populated housing project with several residential units "in close proximity to each other").

While Harris argues that he "was not threatening anyone nor was he aiming at anyone" and that the firearm's discharge into the ceiling ultimately did not endanger the other people in the room, (Dkt. 29, Page 28), wanton endangerment under Kentucky law does not require as much. Rather, wanton conduct occurs where the defendant's actions create a "*substantial danger* of death or serious physical injury to another person." Ky. Rev. Stat. § 508.060 (emphasis added); *see Clark*, 458 F. App'x at 516. Regardless of whether Harris accidentally discharged the firearm, the circumstances surrounding the discharge—his behavior while handling the gun in the presence of Toomey and Wiley—sufficiently demonstrate the danger of death or serious physical injury to

others to qualify as wanton. Harris's recourse to *Swan* to argue that first-degree wanton endangerment is inappropriate here because the family sheltering in place during his arrest was not sufficiently nearby is unavailing. Regardless of whether the family sheltering in place is taken into consideration for Harris's wantonness, it is undisputed that the lives of Toomey and Wiley were endangered by their proximity to him when the gun fired.

Lastly, Harris claims that the government did not meet its burden to show wanton endangerment by a preponderance of the evidence because the discharge of the firearm was "likely" accidental given the design of the manual safety mechanism. (Dkt. 29, Page 21). However, during sentencing, Sergeant Graul and Special Agent Knotts both testified that firearms do not accidentally discharge and that the trigger must be pulled for the firearm to fire. The district court credited the officers' testimonies, and we are loath to second-guess its decision in that regard. *See Shanklin*, 924 F.3d at 919–20. Again, Harris's purported lack of intent to pull the trigger with gun in hand is insufficient to overcome his erratic behavior and discharge of the firearm in the presence of others. Accordingly, we discern no reason to disturb the district court's application of the U.S.S.G. § 2K2.1(b)(6)(B) enhancement given these circumstances.

*Due Process*. As a concluding matter, Harris claims that the district court violated his due process rights because Toomey's "testimony" contained "inconsistent," "unsworn, uncorroborated statements" that served as the "entire basis" for the district court's application of the enhancement. (Dkt. 29, Page 24). "A sentencing court may consider all relevant evidence, whether or not such evidence would be admissible at trial, as long as it has 'sufficient indicia of reliability to support its probable accuracy.'" *United States v. Rice*, 844 F. App'x 844, 846 (6th Cir. 2021) (quoting *United States v. Mukes*, 980 F.3d 526, 534 (6th Cir. 2020)). The indicia-of-reliability standard is a "relatively low hurdle." *United States v. Moncivais*, 492 F.3d 652, 659 (6th Cir. 2007). As such,

courts may consider "[a]ny information" that may be reliable, *Rice*, 844 F. App'x at 846, as long as they "assure themselves of sufficient corroborative evidence." *United States v. Santana*, 723 F. App'x 331, 342 (6th Cir. 2018); *see also* U.S.S.G. § 6A1.3 cmt. (2016).

Though the district court heavily referenced Toomey's statements as relayed through the testimony of Graul and Knotts, Toomey's statements are consistent with other evidence in the record and are corroborated, at least in part, by Wiley's testimony. True, the level of detail varies slightly between accounts, but the accounts are consistent regarding Harris's erratic behavior, the gun in the room, the gun being loaded, and the gun being discharged. *See Rice*, 844 F. App'x at 846 (quoting *Santana*, 723 F. App'x at 340 (citing *United States v. Hunt*, 487 F.3d 347, 353 (6th Cir. 2007))) (for the proposition that "sufficient indicia of reliability" exists where "statements given at different times included at least some corroborative relevant details that matched defendant's conduct"). That Toomey did not testify, and that law enforcement witnesses' testimony about her statements presented slightly different accounts of Harris's "waving" of the gun in the room are not dispositive facts. *Id.* Graul provided testimony consistent with the PSR that Harris waved the gun in the window *after* discharge—which Wiley's testimony does not dispute. Knotts's testimony described Harris waving the firearm to the "beat of the music" and later, due to his agitation, *before* the discharge. (R. 45, PageID 181). Even with these purported 'differences,' the accounts align to weave a consistent narrative of events demonstrating that Harris's behavior was erratic. And the district court reasonably found that Harris's carelessness with the firearm was not likely to have changed "between the time that the police were called and [when] the gun [was] discharged." (*Id.* at 218). To the extent that Wiley's testimony disputed that Harris was waving the gun before it was discharged, the district court was permitted to weigh that testimony against the facts that Harris was not entirely in her line of sight (as compared to Toomey)

and she did not observe the gun discharge. In sum, the testimony of the government's witnesses about Toomey's statements "included at least some corroborative relevant details" concerning Harris's conduct with the firearm. *See Rice*, 844 F. App'x at 846 (quoting *Santana*, 723 F. App'x at 340 (discussing *Hunt*, 487 F.3d at 353)). The evidence in the record, including the witness accounts, corroborate that Harris was in a heightened emotional state and was drinking; together, they paint a picture of a man behaving erratically both before and after the gun was fired. Accordingly, the consistency of the witness testimony coupled with "other record evidence is sufficient to meet the low reliability threshold" and we discern no clear error. *Id.*; *see also United States v. Stout*, 599 F.3d 549, 558 (6th Cir. 2010) (out-of-court statements met the low, "sufficient indicia of reliability" threshold, where they were "generally consistent").

Additionally, the government correctly notes that Harris did not object to the incorporation in the PSR of Toomey's statements—many of which Graul and Knotts expounded on in their testimonies. As a result, by declining to object to the PSR's inclusion of these statements, Harris is deemed to have admitted those facts, and the district court did not clearly err in relying on them. *See United States v. Adkins*, 429 F.3d 631, 632–33 (6th Cir. 2005) (citing *United States v. Stafford*, 258 F.3d 465, 476 (6th Cir. 2001)).

VI.

For the reasons set forth above, we **AFFIRM** the judgment of the district court.