**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 19a0470n.06

Case No. 18-4215

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

|                                    |     |                                      |
|------------------------------------|-----|--------------------------------------|
| UNITED STATES OF AMERICA,          | )   | **FILED**                            |
|                                    | )   | Sep 09, 2019                         |
| Plaintiff-Appellant,               | )   | DEBORAH S. HUNT, Clerk               |
|                                    | )   |                                      |
| v.                                 | )   | ON APPEAL FROM THE                   |
|                                    | )   | UNITED STATES DISTRICT               |
|                                    | )   | COURT FOR THE SOUTHERN               |
| ROBERT SCHEIBLICH,                 | )   | DISTRICT OF OHIO                     |
|                                    | )   |                                      |
| Defendant-Appellee.                | )   |                                      |
|                                    |     | **O P I N I O N**                    |

BEFORE: McKEAGUE, KETHLEDGE, and MURPHY, Circuit Judges.

**McKEAGUE, Circuit Judge.**

The federal government charged Robert Scheiblich as being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). At sentencing, the district judge held that a cross-reference under U.S.S.G. § 2K2.1(c) did not apply. We conclude that the district court erred in finding the § 2K2.1(c) cross-reference did not apply and reverse and remand for resentencing.

## I. Background

Robert Scheiblich[1] and his son, Dillon Scheiblich, sold cocaine to a man named Jesse James. The three of them started using the cocaine at the Scheiblichs' house. Arguments between

---

[1] The defendant Robert Scheiblich is referred to as "Scheiblich," while his son Dillon Scheiblich is referred to by first and last name. Collectively, Robert and Dillon are noted as the "Scheiblichs."

the Scheiblichs and James eventually led the Scheiblichs to tie James to a chair, beat him with a baseball bat, and torture him. The events at the house, however, are not at issue on appeal.

Following the events at the Scheiblich residence, the Scheiblichs took James in their car, a black Cadillac Escalade, and forced him out to the side of the road. According to the government, Dillon Scheiblich fired a shot, using a .357 caliber revolver, close to James's head. And Dillon Scheiblich then allegedly pistol whipped James in the back of the head. The Scheiblichs left James on the side of the road for dead. Law enforcement received 911 calls about shots fired and eventually found James lying on the side of the road. James was bleeding profusely from the back of his head and was in serious but stable condition. James even told law enforcement, "they shot me in the back of the head." James was transported to a nearby hospital, but he eventually left without being discharged and was later found dead in a car. A coroner report stated the cause of death was hypothermia, but the report also noted the blunt-force injuries to James's head.

Approximately ninety minutes after the 911 calls, law enforcement located the Scheiblichs in the black Cadillac. Law enforcement took the Scheiblichs into custody on December 24 and impounded the vehicle. After obtaining a search warrant, a subsequent search of the vehicle revealed a stolen Ruger GP100 .357 caliber revolver, one spent casing, and six hollow-point .357 cartridges in the vehicle. The gun was in the center console next to Scheiblich's wallet and a cell phone.

Scheiblich ultimately pled guilty to the charge of being a felon in possession of a firearm. In the plea agreement, Scheiblich agreed to the following facts:

- The search of Scheiblich's vehicle revealed a Ruger GP100 .357 caliber revolver, located in the center console.

- DNA comparison showed the following: (1) Both Robert and Dillon, his son, were contributors to the DNA sample recovered from the gun; and (2) The likelihood of selecting an unrelated individual at random who

> could be included as a possible contributor to the DNA sample from the gun is rarer than 1 in 1 trillion.
>
> - Further examination of the revolver determined it was operable.
>
> - Robert Scheiblich knowingly possessed a firearm.

In the plea agreement, the parties reserved the right to argue regarding guidelines adjustments, "including but not limited to application of the cross-reference provision from U.S.S.G. § 2K2.1(c)."

Based on the above, the presentence report (PSR) recommended application of the cross-reference under U.S.S.G. § 2K2.1(c)(1), finding Scheiblich used the .357 caliber revolver to commit the other offense of attempted murder. The PSR ultimately arrived at a guideline range between 235 and 293 months but reduced the recommended sentence to the 10-year maximum term authorized by the statute for the § 922(g) charge. Scheiblich objected to the government's use of facts outside of the statement of facts attached to the plea agreement.

## II. Sentencing Hearing

To support its sentencing position, the government presented witness interviews, jail cell calls, physical evidence, and documentary evidence.

*911 Phone Calls & First Responders.* Law enforcement responded to several 911 calls reporting shots fired and a man yelling from the side of the road. First responders picked up James on the roadside at the identified location from the 911 calls, and James was bleeding severely from the back of his skull. James told first responders that the Scheiblichs had forced him into a black Cadillac Escalade after holding him in their home against his will. James said they had "shot" him in the back of the head on the roadside, had earlier robbed him of drugs and money, and had beat him with a baseball bat at their house.

*Location of the Gun.* The search of the vehicle revealed a stolen .357 revolver in the console, next to Scheiblich's wallet and a cell phone. There was one spent casing in the revolver. And there were six live rounds of hollow-point ammunition.

*Blood and DNA Evidence.* The coroner report identified the cause of James's death as hypothermia but also noted blunt-force injuries and lacerations to the head, trunk, and extremities. DNA reports showed the blood from the kitchen and basement matched James. And the DNA on the .357 revolver matched Dillon and Robert Scheiblich. Further, law enforcement found James on the roadside, lying in a pool of his own blood and bleeding profusely from a spot on the back of his head. However, there were no blood marks in the car. This suggests that the injuries inflicted upon James at the house did not cause the bleeding. The district court noted that the fact there was "no blood in the car is not inconsistent with the narrative . . . [James] could have just been not bleeding and then gotten out—because something happened after he got out of the car and before he was found."

*Recorded Interviews.* The government also presented a series of recorded interviews that largely corroborated each other. First, the government presented a recorded video interview with Gregory Spradlin, who was present at the house during the incident with James and who later met up with the Scheiblichs after the roadside incident. According to Spradlin, James and the Scheiblichs were using cocaine, and eventually, Scheiblich "start[ed] wailing on Jesse" with a baseball bat. Scheiblich mentioned at one point that he was going to give James a "hot shot" of drugs to make it look like that was the cause of death. Later that day, the Scheiblichs went to Spradlin's home to take him to the store. Dillon commented that "he had taken care of it . . . [s]aid he had shot him in the back of the head." Spradlin saw the .357 revolver in the vehicle during that time. Spradlin said that "Robert pulled the gun out and showed me and said, 'we've taken care of

it.'" Next, the government presented an audio-recorded interview with Penny Scheiblich, wife of Scheiblich. Penny was present during the house incident. And her story aligns with the other interviews. Finally, the government presented an audio-recorded interview with Franklin Thomas Gabriel, who shared a holding cell with Scheiblich. Scheiblich told Gabriel that he and Dillon had James in the basement and beat him, robbing him of $3,000 and drugs. Scheiblich also said that after they robbed and beat James, they "went to go get rid of him." Scheiblich said they meant to shoot James, but instead shot "up in the air right behind his head." And, finally, Scheiblich claimed to have given James a "hot shot" of drugs, before they "left him for dead."

The district court ultimately did not apply the cross-reference under § 2K2.1(c), finding Scheiblich did not use the gun to pistol whip James and finding the government did not present any evidence above mere possession of the gun that would warrant application of § 2K2.1(c). The government appeals Scheiblich's sentence, arguing that the district court (1) erred as a matter of law in holding that "mere possession" of a gun could not support an application of § 2K2.1(c) and (2) clearly erred in finding Scheiblich did not use or possess the gun to support an application of § 2K2.1(c).

### III. Analysis

Sentences are reviewed for reasonableness under an abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007). A "district court's interpretation of the advisory [sentencing] Guidelines is reviewed de novo, and its findings of fact are reviewed for clear error." *United States v. Brown*, 579 F.3d 672, 677 (6th Cir. 2009) (citing *United States v. Kosinski*, 480 F.3d 769, 774 (6th Cir. 2007)). Clear error exists when the reviewing court is "left with the definite and firm conviction that a mistake has been committed." *United States v. McGee*, 494 F.3d 551, 554 (6th Cir. 2007) (internal quotation marks and citation omitted). And clear error is not present

simply when there are "two permissible views of the evidence." *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008). In the specific context of the cross-reference in § 2K2.1(c), we apply a deferential standard to the district court's "fact-bound legal determinations." *United States v. Harris*, 552 F. App'x 432, 439 n.2 (6th Cir. 2014). Under that standard, which also applies to the similarly worded enhancement in § 2K2.1(b)(6), we "accord due deference to the district court's determination that the firearm was [or was not] used or possessed in connection with" another offense. *See United States v. Shanklin*, 924 F.3d 905, 919 (6th Cir. 2019) (citation omitted). Where, however, the question concerning this provision is "strictly [one] of law," de novo review applies. *United States v. Taylor*, 648 F.3d 417, 431 (6th Cir. 2011) (citation omitted).

As for evidence available for sentencing guidelines application, it is undisputed that a district court may look to evidence outside of the plea agreement for sentencing purposes, so long as those facts are proved by a preponderance of the evidence. *See United States v. Watts*, 519 U.S. 148, 156 (1997) (per curiam). The evidence need not be based on charged conduct if the sentence is not greater than the statutory maximum for the underlying offense. *See United States v. James*, 575 F. App'x 588, 593-95 (6th Cir. 2014). And while the sentencing guidelines are advisory, a district court still may not abuse its discretion in the application of the guidelines. Otherwise, the guidelines would be rendered meaningless.

The cross-reference in § 2K2.1(c) applies where "the defendant used or possessed any firearm or ammunition cited in the offense of conviction in connection with the commission or attempted commission of another offense." U.S.S.G. § 2K2.1(c)(1). Here, for purposes of § 2K2.1(c)(1), the government must show by a preponderance of the evidence that Scheiblich "used or possessed" the specific gun at issue—the .357 caliber revolver referenced in the illegal possession crime—"in connection with the commission or attempted commission of another

offense." U.S.S.G. § 2K2.1(c)(1); *see* U.S.S.G. § 6A1.3 cmt.; *see also Watts*, 519 U.S. at 156. The government alleges that the other offense here is either attempted murder or, alternatively, kidnapping. On appeal, the government narrowly focuses on the conduct at the roadside to constitute the attempted murder or kidnapping and does not rely on the conduct at the house.

First, the district court erred as a matter of law when interpreting § 2K2.1(c) to impose too stringent of a requirement for what is required of "use or possession" of the gun. The plain text of § 2K2.1(c)(1) requires only that the defendant "used or *possessed* any firearm" cited in the offense in connection with the commission or attempt of another crime. U.S.S.G. § 2K2.1(c) (emphasis added). Actual use of the gun is not required. Further, the commentary to § 2K2.1(c) makes clear that the cross-reference applies if the firearm "facilitated, or had the *potential* of facilitating" another offense. U.S.S.G. § 2K2.1 cmt. n.14(A) (emphasis added). According to Webster's dictionary, "facilitate" means "to make easier or less difficult." Webster's Third New International Dictionary (1986).

Section 2K2.1 and the accompanying comments do not define the phrase "in connection with," but cases analyzing similar language in § 2K2.1(b) are instructive. An enhancement under § 2K2.1(b)(6) applies where "any firearm" is "used or possessed . . . in connection with another felony offense," instead of the firearm cited in the charged offense. U.S.S.G. § 2K2.1(b)(6)(B). Section 2K2.1(b) contains the identical phrase "used or possessed any firearm . . . in connection with." And it "is axiomatic that identical words used in different parts of the same act are intended to have the same meaning." *United States v. Howse*, 478 F.3d 729, 733 (6th Cir. 2007) (quoting *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 203 n.12 (1993)). Courts interpreting the language of § 2K2.1(b) have found that a firearm facilitates the commission of an offense if it makes it "easier or less difficult" or serves "some emboldening role in [a] defendant's felonious

conduct." *United States v. Coleman*, 627 F.3d 205, 212 (6th Cir. 2010) (internal quotation marks and citation omitted) (finding ammunition that was easily accessible emboldened defendant in knowledge he was one step closer to having a fully-loaded firearm to protect himself and his illegal drugs). The firearm "need not be actively used" in the other offense so long as it has "the potential to promote" the offense. *United States v. Angel*, 576 F.3d 318, 320 (6th Cir. 2009) (internal quotation marks and citation omitted). Further, the government need only show a "non-coincidental nexus existed between the gun and the" offense. *United States v. McWhorter*, 445 F. App'x 835, 837 (6th Cir. 2011). And this nexus exists where the gun has the "potential of facilitating" the offense. *Id.* It is enough that a defendant possessed the gun in connection with a felony, and possession can be actual or constructive. *United States v. Hardin*, 248 F.3d 489, 498 (6th Cir. 2001).

The district court found uncompelling the government's argument that mere possession of the gun emboldened Scheiblich to participate in the alleged attempted murder or kidnapping, concluding that, "the law simply does not support it." Not so. Possession of a gun that emboldens a defendant in the commission of another crime is a factor to consider in an analysis under § 2K2.1(b) or (c). The district court found that the government's so-called "fortress theory" was limited to drug trafficking offenses. Again, this is wrong as a matter of law. Close or mere "proximity" is limited to drug trafficking offenses. *See* U.S.S.G. § 2K2.1, cmt. n.14(B) ("close proximity to drugs" warrants application of § 2K2.1(b)(6)(B) or (c)(1) when the other offense is a drug trafficking offense); *United States v. Shields*, 664 F.3d 1040, 1045 (6th Cir. 2011) (finding the enhancement under § 2K2.1(b) did not apply because the government did not establish the gun emboldened the defendant and finding "close proximity" alone not enough for a non-drug trafficking related offense). But the emboldening role of a firearm, which goes beyond close

proximity, is not limited to drug-related offenses under § 2K2.1. *See United States v. Jones*, 470 F. App'x 477, 480 (6th Cir. 2012) (facilitated resisting arrest); *United States v. Burke*, 345 F.3d 416, 427-28 (6th Cir. 2003) (guns could have protected illegal VIN-flipping operation); *United States v. Bullock*, 526 F.3d 312, 318 (6th Cir. 2001) ("undoubtedly emboldened" defendant to make threatening phone calls to congressman), *abrogated on other grounds by Taylor*, 648 F.3d at 431. While these cases apply § 2K2.1(b), that is beside the point. Section 2K2.1(b)(6) contains the same language as § 2K2.1(c)(1) and should therefore be interpreted the same. *Howse*, 478 F.3d at 733. So, the district court was wrong to find the "law does not support" a theory that the emboldening role of a gun is enough. Possession is explicitly included in the plain text of § 2K2.1(c)(1) and the cross-reference may apply if that possession potentially facilitates—e.g., emboldens—a defendant to commit another crime.

Second, the district court found that under either of the government's theories—(a) that Scheiblich pistol whipped James or (b) that the gun emboldened Scheiblich in the commission of another offense—the government did not produce enough evidence to support application of § 2K2.1(c). Here, we review the district court's factual findings for clear error and give due deference to the district court in its application of the guidelines. We need not reach the pistol-whipping issue because we find that § 2K2.1(c) applies due to Scheiblich's possession of the gun. The district court clearly erred in finding that possession of the gun did not facilitate the commission of another offense against James. The district court gave "no weight" to two pieces of crucial evidence: the 911 calls of shots fired, and the fact law enforcement found the .357 caliber revolver in the center console. The district court did not take issue with the reliability of those facts, but summarily dismissed them as inapplicable to its analysis. Completely ignoring the significance of those two facts, the district court found the government did not produce any

relevant evidence, other than mere proximity. This was clear error. There can be no doubt that shots fired and the fact the gun was found in the center console of the vehicle—located right next to Scheiblich's wallet and found only 90 minutes after the 911 calls—are pieces of evidence that are relevant above and beyond mere proximity. Even with giving due deference to the district court, there is no doubt these facts establish a sufficient nexus between the gun and the alleged other offenses, as our precedent shows.

In *Burke*, we found that guns were possessed in connection with another felony offense when three guns were located across the driveway from the defendant's illegal operation, some of the weapons were loaded, and one had been discharged. 345 F.3d at 427. Proximity and ready access were enough to show a sufficient nexus by a preponderance of the evidence. So too here. The .357 caliber revolver was positioned in the center console of the vehicle, next to Scheiblich's wallet. Additionally, there were six live rounds of hollow-point ammunition in the vehicle. The fact the gun was in the center console, operable, and readily-accessible shows, at the very least, that the gun potentially facilitated the attempted murder or kidnapping. Moreover, the 911 calls indicate the gun did not stay in the center console for the entirety of the roadside incident. The district court clearly erred in giving "no weight" to these two facts. Indeed, there is even more evidence that shows the .357 revolver's nexus to the other offenses: James himself told the police he was shot, Spradlin identifies the .357 revolver's connection to the roadside incident, and the Gabriel interview notes the .357 revolver's significance. All that is needed is a showing that the .357 caliber revolver had the *potential* to facilitate the other crime. Certainly, the .357 revolver's location and operability facilitated the commission of another offense. The district court clearly erred in finding no connection between the .357 revolver and another offense to support an application of the § 2K2.1(c) cross-reference.

Finally, the cross-reference applies if a court finds, by a preponderance of the evidence, that a defendant committed another offense. And "'another offense,' for purposes of subsection (c)(1), means any federal, state, or local offense, other than the explosive or firearms possession or trafficking offense, regardless of whether a criminal charge was brought, or a conviction obtained." U.S.S.G. § 2k2.1 cmt. n.14(C), § 2K2.1(c). Here, the government cites to two other possible offenses: kidnapping and attempted murder. The defendant need not be charged with the other offense at state court.

Section 2K2.1(c)(1)(A) provides a cross-reference to § 2X1.1, the guidelines applicable to attempt, solicitation, and conspiracy. Section 2X1.1 in turn calculates the applicable base offense level by reference to the guidelines for the relevant substantive crime. Where attempt, solicitation, and conspiracy are expressly covered by another offense guideline, that guideline is applied directly. Attempted murder is expressly covered in § 2A2.1, and kidnapping is expressly covered in § 2A4.1. Attempted murder carries a slightly higher offense level than that of kidnapping. *Compare* § 2A2.1 *with* § 2A4.1.

On this record there can be no doubt that, by a preponderance of the evidence, James was forcibly transported to the roadside, which resulted in physical harm to James. Under Ohio law, "[n]o person, by force, threat, or deception . . . shall knowingly do any of the following, under circumstances that create a substantial risk of serious physical harm to the victim . . . (1) [r]emove another from the place where the other person is found; (2) [r]estrain another of the other person's liberty." Ohio Rev. Code Ann. § 2905.01(B). It is undisputed that the Scheiblichs transported James from the Scheiblich residence to the roadside and James suffered significant injuries. The district court found that James's "injuries were extensive and not all caused by hypothermia."

Scheiblich's possession of the gun and the gun's operability facilitated, or, at the very least, had the potential to facilitate, the kidnapping offense.

As for the attempted murder, the district court never reached the issue of whether Scheiblich had the requisite mental state. Federal law requires malice aforethought, 18 U.S.C. § 1111.[2] And the district court must reach this issue first.

## IV. Conclusion

For these reasons we reverse the district court opinion and remand to apply the § 2K2.1(c) cross-reference for the kidnapping offense under § 2A4.1. On remand, we instruct the district court to determine whether the government can establish by a preponderance of the evidence the elements of attempted murder. If the district court finds an attempted murder occurred, then § 2K2.1(c) would apply for the attempted murder offense under § 2A2.1.

---

[2] Section 2A2.1 expressly covers attempted murder and provides for a base offense level of 33 "if the object of the offense would have constituted first degree murder" or a base offense level of 27 "otherwise." U.S.S.G. § 2A2.1(a). First degree murder is defined as "conduct that, if committed within the special maritime and territorial jurisdiction of the United States, would constitute first degree murder under 18 U.S.C. § 1111." U.S.S.G. § 2A2.1 cmt. n.1. We need not consider other attempted homicide offenses given those offenses carry a lower base offense level than that of kidnapping.